IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ERIE DIVISION

| | |
|---|---|
| GREGORY THOMAS,<br><br>Plaintiff<br><br>vs.<br><br>MICHAEL CLARK, et al.,<br><br>Defendants | 1:21-CV-00230-RAL<br><br>RICHARD A. LANZILLO<br>Chief United States Magistrate Judge<br><br>Memorandum Opinion on Defendants'<br>Motion for Summary Judgment<br><br>ECF NO. 92 |

I.   Introduction

Plaintiff Gregory Thomas, an inmate confined at the State Correctional Institution at Albion (SCI-Albion), initiated this pro se civil rights action seeking monetary relief pursuant to 42 U.S.C. § 1983. In his Complaint, Thomas asserts that officials at SCI-Albion violated his First, Eighth and Fourteenth Amendment rights by: 1) enacting a policy that prevented him from adding certain names to his telephone contact list; and 2) failing to provide him with necessary medical accommodations for a skin disorder. ECF No. 10. As Defendants, Thomas has identified the following individuals: Michael Clark, the former Superintendent of SCI-Albion; Dorina Varner, the Chief Grievance Officer for the DOC; Major Patricia Thompson, a corrections officer at SCI-Albion; and the former Chief of the DOC's Bureau of Health Care Services (BHCS). *Id.*

Following the close of discovery, Defendants filed a Motion for Summary Judgment accompanied by a supporting brief, Concise Statement of Material Facts, and an Appendix of Exhibits. ECF Nos. 92-95. Thomas responded by filing an opposition brief, Statement of

1

Material Facts in Dispute, and an Affidavit. ECF Nos. 98-102. Thomas later filed several supplemental briefs and exhibits. ECF Nos. 103, 105. As such, Defendants' motion is ripe for adjudication.[1]

II.   Factual Background

The following factual recitation is derived from the statements of fact and supporting exhibits submitted by the parties. Prior to the events underlying this litigation, the Pennsylvania Department of Corrections (DOC) enacted an inmate telephone policy, DC-ADM 818, which purported to "grant inmates the privilege of legitimate telephone communications with individuals in the community, while at the same time protecting society from harm, including, but not limited to, criminal activity, harassment, threats, and intimidation using the inmate telephone system." ECF No. 95-1 at 2, 27. The policy required inmates to obtain an Inmate Personal Identification Number (IPIN) and submit an Inmate Telephone Authorization Form (DC-8A) containing a list of the individuals who they wished to call. ECF No. 94 ¶ 6. Aside from their attorney, inmates were restricted to twenty active telephone numbers on their IPIN at any given time. ECF No. 95-1 at 13, 38. Those numbers must be pre-approved by the DOC and are subject to various restrictions. *Id.*

Under prior versions of DC-ADM 818, one such restriction prohibited two or more inmates from having duplicate telephone numbers on their IPINs. ECF No. 95-1 at 15. The effect of this restriction was to prevent an inmate from adding a telephone number to their IPIN if that number already appeared on another inmate's IPIN (unless that number belonged to an immediate family member, a media member, an elected official, or the PA Prison Society). *Id.*

---

[1] The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge to conduct all proceedings in this case, including the entry of final judgment, as authorized by 28 U.S.C. § 636.

The DOC removed that restriction from DC-ADM 818 on February 3, 2015, while reserving the right to curtail or rescind inmate telephone privileges for administrative or disciplinary reasons. ECF No. 94 ¶¶ 8-9. Following that change, the DOC did not have a formal policy addressing duplicate telephone numbers until an updated version of DC-ADM 818 went into effect on March 21, 2022.[2] ECF No. 95-1 at 27.

During this intervening period, the Security Office at SCI-Albion began receiving numerous reports from staff that many inmates, often affiliated with gangs, were abusing the telephone system. An investigation conducted in 2020 uncovered the following pattern: an inmate would commandeer another inmate's IPIN to contact an individual outside of the prison, and upon receiving a misconduct and losing access to that IPIN, find another inmate with the same outside telephone number on their list and use that inmate's IPIN to continue to make calls. ECF No. 94 ¶ 15. This resulted in a handful of dominant inmates controlling access to the telephone system and blocking other inmates from making calls. *Id.* ¶ 16. To prevent this, the Security Office at SCI-Albion recommended a series of changes designed to "greatly decrease the number of inmates abusing phone privileges on housing units and alleviate some of the issues of inmates controlling phones on housing units." *Id.* ¶ 18. One of those changes was the removal of all duplicate phone numbers from inmates' authorized contact lists. *Id.* Recognizing that there might be legitimate reasons for inmates to have the same phone number listed as a contact, the Security Office also recommended that inmates be allowed to resubmit duplicate numbers for approval so long as those numbers reflected legitimate personal connections, such as immediate family members. *Id.* Superintendent Clark approved the proposal on November 13, 2020, and the following notification was published to inmates:

---

[2] The current version of the policy permits the same telephone number to appear on multiple inmates' IPIN lists.

> Beginning on Monday January 4th [2021], phone numbers on more than one inmate list will be removed. Numbers that appear to be an immediate family member will remain on one list. The period of time for inmates to submit DC-88 Supplementary Authorized Inmate Telephone Numbers Form will be extended for the month of January only, till Wednesday January 13th. Moving forward, inmates who seek to have a phone number added to their phone list that is already on another list should see their unit counselor to start the process.

ECF No. 95-1 at 49.

Shortly thereafter, Clark and Thompson "authorized the removal of [Thomas'] friends from [his] phone list because they were on other inmates' phone list and they were not [his] family members." ECF No. 10 at 5. Rather than submit the names of those individuals for reapproval, Thomas filed a grievance alleging that the removal violated the First Amendment. ECF No. 95-1 at 55. The DOC denied his grievance at each step of the administrative process, directing him to utilize the "approval process in place at [SCI-Albion] which simply involves contacting the Security Office." *Id.* at 58. Thomas later submitted two phone numbers for approval, each of which was rejected because the individuals were not immediate family members. ECF No. 94 ¶¶ 27-28.

In addition to his First Amendment claim, Thomas alleges that the director of BHCS Clinical Services displayed deliberate indifference to his medical needs in violation of the Eighth Amendment by refusing to provide him with a medically necessary electric razor. ECF No. 10 at 6. Thomas' medical records indicate that he was diagnosed with acne keloids, a skin condition that can cause scarring on the face and body, on October 26, 2020. ECF No. 94 ¶ 29. Thomas was prescribed a topical lotion and received medical authorization to obtain an electric trimmer. *Id.* ¶ 30. Despite that authorization, the Chief of the BCHS ultimately denied Thomas' request for an electric razor. *Id.* ¶ 33.

4

III.   Standard of Review

Federal Rule of Civil Procedure 56(a) requires the court to enter summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Under this standard "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. *Anderson*, 477 U.S. at 248; *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992).  An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 257; *Brenner v. Local 514, United Bhd. of Carpenters and Joiners of Am.*, 927 F.2d 1283, 1287-88 (3d Cir. 1991).

When determining whether a genuine issue of material fact remains for trial, the court must view the record and all reasonable inferences to be drawn therefrom in favor of the nonmoving party. *Moore v. Tartler*, 986 F.2d 682 (3d Cir. 1993); *Clement v. Consol. Rail Corp.*, 963 F.2d 599, 600 (3d Cir. 1992); *White v. Westinghouse Electric Co.*, 862 F.2d 56, 59 (3d Cir. 1988).  To avoid summary judgment, however, the nonmoving party may not rest on the unsubstantiated allegations of his or her pleadings.  Instead, once the movant satisfies its burden of identifying evidence that demonstrates the absence of a genuine issue of material fact, the nonmoving party must go beyond his pleadings with affidavits, depositions, answers to interrogatories or other record evidence to demonstrate specific material facts that give rise to a genuine issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

Further, under Rule 56, a defendant may seek summary judgment by pointing to the absence of a genuine fact issue on one or more essential claim elements. The Rule mandates summary judgment if the plaintiff then fails to make a sufficient showing on each of those elements. When Rule 56 shifts the burden of production to the nonmoving party, "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. *See Harter v. G.A.F. Corp.*, 967 F.2d 846, 851 (3d Cir. 1992).

IV.  Analysis

1.  Personal involvement

To prevail on a § 1983 claim, a plaintiff "must show that each and every defendant was 'personal[ly] involve[d]' in depriving him of his rights." *Kirk v. Roan*, 2006 WL 2645154, at *3 (M.D. Pa. 2006) (quoting *Evancho v. Fischer*, 423 F.3d 347, 353 (3d Cir. 2006)). This means that each defendant must have played an "affirmative part" in the complained-of misconduct. *Iqbal*, 556 U.S. at 677 ("In a § 1983 suit ... [a]bsent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct."); *Oliver v. Beard*, 358 Fed. Appx. 297, 300 (3d Cir. 2009). In the absence of specific allegations that a defendant played a role in depriving the plaintiff of a constitutional right, dismissal is appropriate. *See, e.g., Mearin v. Swartz*, 951 F.Supp.2d 776, 781-82 (W.D. Pa. 2013) (dismissing claims pursuant to Rule 12(b)(6) because the plaintiffs had failed to set forth sufficient facts to establish that certain defendants had played an affirmative part in the alleged Eighth Amendment violation).

These principles apply with equal force where the defendants are supervising prison officials. *See, e.g., Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1998) (noting that liability for supervisory officials must still be based on "personal involvement in the alleged

6

wrongs"); *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005) ("[L]iability cannot be predicated solely on the operation of respondeat superior."). Although a supervisor cannot encourage constitutional violations, "a supervising public official has [no] affirmative constitutional duty to supervise and discipline so as to prevent violations of constitutional rights by his or her subordinates." *Chinchello v. Fenton*, 805 F.2d 126, 133 (3d Cir. 1986); *Brown v. Grabowski*, 922 F.2d 1097, 1120 (3d Cir. 1990). Rather, a supervisor-defendant may only be liable for unconstitutional acts undertaken by subordinates if the supervisor either: (1) with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm; or (2) participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in the subordinate's unconstitutional conduct. *A.M. ex rel. J.M.K. v. Luzerne Cty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004).

In the instant case, the only basis for Thomas' claim against Varner appears to be her role in denying each of his administrative grievances. ECF No. 11 at 4. As described above, this type of averment is insufficient to establish personal involvement in the deprivation of a constitutional right. *See, e.g., Mincy v. Chmielsewski*, 508 Fed. Appx. 99, 104 (3d Cir. 2013) ("[A]n officer's review of, or failure to investigate, an inmate's grievances generally does not satisfy the requisite personal involvement."); *Kloss v. SCI-Albion*, 2018 WL 4609144, at *4 (W.D. Pa. Aug. 15, 2018) (allegation that supervisory defendant was "made aware of several issues of the plaintiff's and . . . failed to help him" is insufficient to state a claim for relief); *Rogers v. United States*, 696 F.Supp.2d 472, 488 (W.D. Pa. 2010) ("If a grievance official's only involvement is investigating and/or ruling on an inmate's grievance after the incident giving rise to the grievance has already occurred, there is no personal involvement on the part of that

official."). Because Thomas' claim against Varner is based entirely upon her supervisory role in the prison system, summary judgment is appropriate.

2. Explicit source rule

Although Thomas' challenge to SCI-Albion's telephone policy is firmly grounded in the First Amendment, his Complaint includes a passing reference to the Fourteenth Amendment's Due Process Clause. *See* ECF No. 10 at 8. In response to a question on the standard civil complaint form asking him to describe the claims that he asserted in his administrative grievance, Thomas responded: "First Amendment of the Phone Discrimination and Eighth Amendment for ELECTRIC TRIMMERS. Due Process 14th Amendment." ECF No. 10 at 8. While he doesn't reference the Fourteenth Amendment anywhere else in his Complaint, Thomas argues in his opposition brief that Defendants violated his substantive due process rights by removing several individuals from his IPIN list. ECF No. 9 at 6. Thomas contends that this violated the Fourteenth Amendment because he "was on a course set by DOC policy that protected his free speech" until "Defendants changed the due process course." *Id.*

To the extent that Thomas is attacking the prison's telephone policy under both the First and Fourteenth Amendments, his Fourteenth Amendment claim runs afoul of the more-specific-provision rule. As explained by the United States Supreme Court in *United States v. Lanier*, the more-specific-provision rule provides that, "if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." 520 U.S. 259, 272 n.7 (1997). *See also Albright v. Oliver*, 510 U.S. 266, 273 (1994) ("Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized

8

notion of substantive due process, must be the guide for analyzing these claims."). Pursuant to this principle, Thomas' claim that Defendants violated his right to free speech must be analyzed "under the more specific provision of the First Amendment, rather than the rubric of substantive due process." *Brown v. Wetzel*, 2022 WL 4647330, at *21 (M.D. Pa. Sept. 30, 2022). *See also Fears v. Beard*, 532 Fed. Appx. 78, 81-82 (3d Cir. 2013) (concluding that, to the extent that the prisoner-plaintiff had attempted to assert his First Amendment claims as violations of substantive due process, the district court had correctly dismissed such alleged violations under the more-specific-provision rule). Accordingly, Plaintiff's Fourteenth Amendment claim must be dismissed as to any allegation that his free speech rights were violated.

3. First Amendment

Turning to the heart of this action, Thomas alleges that officials at SCI-Albion violated his constitutional rights by removing friends and family members from his approved telephone call list. The Court of Appeals for the Third Circuit has described the implicated First Amendment right as "the right to communicate with people outside prison walls." *Almahdi v. Ashcroft*, 310 Fed. Appx. 519, 521–22 (3d Cir. 2009) (quoting source omitted). Access to a telephone "provides a means of exercising that right." *Id.* Nevertheless, that right is "subject to rational limitations in the face of legitimate security interests of the penal institution." *Perez v. Federal Bureau of Prisons*, 229 Fed. Appx. 55, 57 (3d Cir. 2007) (quoting *Strandberg v. City of Helena*, 791 F.2d 744, 747 (9th Cir. 1986)). In other words, "prisoners 'ha[ve] no right to unlimited telephone use,' and reasonable restrictions on telephone privileges do not violate their First Amendment rights." *Almahdi*, 310 Fed. Appx. at 522 (noting that "regulations limiting telephone use by inmates have been routinely sustained as reasonable.").

To determining whether a regulation is reasonable, the United States Supreme Court has endorsed the following four-part test: (1) whether the regulation or practice bears a "valid, rational connection" to a legitimate and neutral governmental objective; (2) whether prisoners have alternative ways of exercising the circumscribed right; (3) "[what] impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and (4) whether alternatives exist that fully accommodate the prisoner's rights at de minimis cost to valid penological interests. *See Turner v. Safley*, 482 U.S. 78, 93 (1987). In performing this analysis, the Supreme Court has cautioned that prison administration is "a task that has been committed to the responsibility of [the legislative and executive] branches, and separation of powers concerns counsel a policy of judicial restraint." *Id.* (citing *Procunier v. Martinez*, 416 U.S. 396, 405 (1974)). Moreover, "[w]here a state penal system is involved, federal courts have . . . additional reason to accord deference to the appropriate prison authorities." *Id.* This is especially true "when a regulation implicates prison security." *Fraise*, 283 F.3d at 516. Finally, the Court notes that "[t]he burden . . . is not on the State to prove the validity of prison regulations but on the prisoner to disprove it." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) (citing sources omitted); *Ivy v. Blake*, 2023 WL 2245204, at *3 (W.D. Pa. Feb. 27, 2023) ("[Plaintiff] bears the ultimate burden of demonstrating the invalidity of the prison's policy.").

Applying these principles here, the Court first considers whether the regulation or practice Thomas is challenging bears a "valid, rational connection" to a legitimate and neutral governmental objective. *Turner*, 482 U.S. at 93. We conclude that it does. Defendants have submitted uncontradicted evidence that the purpose of the telephone restriction was to curb gang

activity[3] and prevent abusive and gang-affiliated inmates from controlling access to the telephones. Courts have consistently recognized such restrictions as reasonably related to legitimate penological interests. *See, e.g., Turner*, 482 U.S. at 93 (upholding policy prohibiting correspondence between inmates at different institutions as reasonably related to the valid corrections goals of curbing gang activity and maintaining institutional order and security); *Perez*, 229 Fed. Appx. at 57 (restriction of social telephone calls to one per week for prisoners with a history of using the telephone to conduct criminal activity "is clearly reasonable because it relates to the legitimate penological goal of public and institutional safety"); *Fraise v. Terhune*, 283 F.3d 506 (3d Cir. 2002) (restriction implemented to curb gang activity was "rationally related to the goal of prison safety and security"). Moreover, because institutional security is at issue, "a measure of deference is especially appropriate." *Fraise*, 283 F.3d at 516.

    The Court next considers whether prisoners have alternative ways to exercise the circumscribed right. Courts have widely held that, "where a prisoner has access to alternative means of communicating with family and friends outside of prison, such as via the mail or in person visits, restrictions on telephone use are viewed as less serious and are more likely to be found reasonable." *Love v. New Jersey Dep't of Corr.*, 2015 WL 2226015, at *3 (D.N.J. May 12, 2015). Despite bearing the burden of proof on the issue, Thomas has failed to provide any evidence that he was unable to communicate with the individuals removed from his IPIN list through alternative channels such as email, letters, and personal visits. In the absence of any such evidence, courts have repeatedly upheld similar regulations. *See also Almahdi*, 310 Fed. Appx. at 522 ("Almahdi makes no assertion – and there is no evidence – that he lacked

---

[3] In his opposition brief, Thomas emphasizes that he is not a gang member and has no gang affiliation. ECF No. 99 at 7. He has not adduced any evidence, however, to dispute that the general purpose of the restriction was to curtail gang activity at SCI-Albion.

alternative means of communicating with persons outside the prison ... Accordingly the telephone restrictions did not violate the First Amendment."); *Perez*, 229 Fed. Appx. at 58 n. 3 (denying First Amendment claim and noting in part that telephone limitation did not affect inmate's ability to communicate with people outside the prison through letter writing and visitation); *Love*, 2015 WL 2226015, at *3 (upholding regulation banning inmates from placing cellular telephone numbers on their approved phone lists); *Johnson v. Bledsoe*, 2012 WL 258680, at *2 (M.D. Pa. Jan.27, 2012) ("More recent decisions have concluded that where an inmate has available, alternative means of communicating with the outside world, i.e., mail privileges, a § 1983 action alleging improper denial of telephone access was subject to dismissal.").

The third and fourth *Turner* factors address the impact of the asserted constitutional right on inmates, guards, and prison operations, and whether alternatives exist that would fully accommodate the prisoner's rights at *de minimis* cost to valid penological interests. While Thomas generally avers that the prison's goal could be accomplished using high-tech telephone monitoring technology already in place, the investigating officer's memorandum to Superintendent Clark noted that prior attempts to monitor and prevent gang control of the telephones resulted in "a large number of man hours and minimal impact on the use of multiple pins." ECF No. 95-1 at 48. Thomas has not identified any evidence refuting this assertion. The Court also notes that the policy included a built-in accommodation procedure permitting inmates to petition their unit counselor to have a duplicate phone number restored to their phone list, if appropriate. Nothing in the record suggests that a less restrictive alternative was available.

Based on the foregoing, the Court concludes that each of the four *Turner* factors, to various degrees, support the validity of the prison's telephone policy. Because the policy

represented a "rational limitation" on Thomas' constitutional rights "in the face of legitimate security interests," *Perez*, 229 Fed. Appx. at 57, summary judgment is warranted.

4.  Eighth Amendment

Thomas' final claim is that the former Chief of BHCS violated the Eighth Amendment's prohibition against cruel and unusual punishment by displaying deliberate indifference to his serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97 (1976) (stating that "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment") (internal quotation omitted). To establish a violation of his constitutional right to adequate medical care, a plaintiff is required to allege facts that demonstrate: (1) a serious medical need, and (2) acts or omissions by prison officials that indicate deliberate indifference to that need. *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). Such indifference is manifested by an intentional refusal to provide care, delayed medical treatment for non-medical reasons, denial of prescribed medical treatment, a denial of reasonable requests for treatment that results in suffering or risk of injury, *Durmer v. O'Carroll*, 991 F.2d 64, 68 (3d Cir. 1993), or "persistent conduct in the face of resultant pain and risk of permanent injury." *White v. Napoleon*, 897 F.2d 103, 109 (3d Cir. 1990).

Thomas' claim in the instant case centers on a skin condition that causes him to form "acne keloids." According to the Mayo Clinic,[4] a keloid "is a thick raised scar" that "can occur

---

[4] The descriptions and quotations pertaining to keloids outlined in this paragraph can be located at https://www.mayoclinic.org/diseases-conditions/keloid-scar/symptoms-causes/syc-20520901 (last visited March 23, 2023). The Court may take judicial notice of these background facts pursuant to Federal Rule of Evidence 201(b)(2) because they are "not subject to reasonable dispute [and are] capable of accurate and ready determination by resort to a source whose accuracy cannot be reasonably questioned." *See, e.g., Rankins v. Washington*, 2017 WL 4364060, at *3 (W.D. Mich. Sep. 29, 2017) (taking judicial notice of facts presented on the Mayo Clinic's website); *Giddings v. Cradduck*, 2017 WL 2791345, at *6 n. 4 (W.D. Ark. June 6, 2017) (same); *Green v. CDCR*, 2016 WL 6124148, at *1 n. 1 (E.D. Cal. Oct. 19, 2016) (same); *Arce v. Chicago Transit Authority*, 193 F.Supp.3d 875, 881 (N.D. Ill. 2016) (same).

wherever you have a skin injury." A keloid scar manifests as a "[t]hick, irregular scarring, typically on the earlobes, shoulders, cheeks, or middle chest." Keloid scars can cause itchiness, discomfort, and emotional distress. "Even minor injuries – such as ingrown hairs, cuts and scratchers – can incite a keloid to grow."

Thomas' medical records reveal that he was diagnosed with keloids on his face, beard area, and sporadically over his body on October 20, 2020. ECF No. 95-2 at 61. A prison medical professional prescribed a topical lotion and cleared Thomas to receive an electric razor.[5] *Id.* at 62. For reasons that are somewhat unclear, Thomas never received the razor. While his medical records state that the BHCS Chief denied his request entirely, his grievance records suggest that an electric razor was ordered but that Thomas refused to accept it.[6] *Id.* at 51, 129.

Whichever the case, this discrepancy is ultimately immaterial, at least at this stage in the proceedings, for a simple reason: Defendants' summary judgment motion does not challenge the subjective element of Thomas' Eighth Amendment claim. *See Rouse*, 182 F.3d at 197 (stating that a plaintiff must demonstrate "acts or omissions by prison officials that indicate deliberate indifference"). Instead, Defendants focus exclusively on the objective element of Thomas' claim, arguing that acne keloids do not rise to the level of a "serious medical need." *Id.* As our Court of Appeals has explained, a "serious" medical condition is one "such that a failure to treat can be expected to lead to substantial and unnecessary suffering, injury, or death." *Tsakonas v. Cicchi*, 308 Fed. Appx. 628, 632 (3d Cir. 2009) (quoting source omitted). Defendants equate Thomas' keloids to the type of "rashes and other minor skin conditions" that have "repeatedly

---

[5] As explained by Thomas, the benefit of an electric razor for an individual prone to keloids is that it eliminates the nicks and cuts from straight razor shaving that can cause keloid scars to form.

[6] The most plausible explanation for these conflicting records might be that the BCHS Chief disapproved Thomas' request for a particular brand of electric razor and that Thomas then rejected the offered alternative. For the reasons discussed below, this discrepancy is ultimately immaterial.

been found by this court not to represent 'serious harm' sufficient to prevail on an Eighth Amendment claim." ECF No. 93 at 9 (citing *Fielder v. Fornelli*, 2011 WL 4527322, at *8 (W.D. Pa. 2011)).

While the underlying legal principle cited by Defendants is accurate, their application of that principle misses the mark. Numerous federal courts have found that keloids, under certain circumstances, are sufficiently serious to implicate the Eighth Amendment. *See, e.g., Brock v. Wright*, 315 F.3d 158, 163 (2d Cir. 2003) (evidence that plaintiff's keloid scar was "a source of chronic pain that interferes with his ability to conduct tasks associated with daily living" was sufficient to survive summary judgment); *Revels v. Meyers*, 2009 WL 3122514, at *8 (C.D. Cal. Sept. 25, 2009) (whether inmate's keloids constituted a serious medical need presented a triable issue of fact where plaintiff experienced "continuous pain, headaches, and lack of sleep" as a result of the untreated condition); *Harris v. Winslow*, 2006 WL 1096011, *4 (N.D. Cal. Apr. 25, 2006) (triable issue of fact as to whether keloid on scalp, which eventually grew to 5 cm by 3 cm, was a serious medical need when plaintiff complained that it was itchy and painful and caused him to lose sleep); *Stallings v. Zhang*, 2014 WL 2727071, at *5 (N.D. Ill. June 16, 2014) ("[T]he court finds that Stalling's keloid meets the objective prong of a deliberate indifference claim."). In light of these decisions, the Court cannot embrace Defendants' argument that keloids are insufficiently serious, as a matter of law, to ever satisfy the objective prong of a deliberate indifference claim.

This conclusion, however, does not end the analysis. In each of the cases cited above, the record contained plausible evidence that the plaintiff's keloid scars were the source of an active and ongoing manifestation of serious injury – i.e., that they were prone to infection, bleeding, or drainage; caused severe, chronic pain; or interfered with daily life functions. No such allegations

appear in the record here. Although Thomas accurately notes that a keloid can scar the skin and increase in size over time, *see* ECF No. 99 at 9, he has not introduced any evidence concerning the current severity of his own keloid scars. A review of his medical records suggests that, rather than causing the type of several pain and discomfort described in the cases cited above, Thomas' condition was mild enough that the only medical intervention required was a topical ointment (which, notably, he failed to renew when the prescription expired). In the absence of any evidence from which a rational jury might infer that Thomas' keloid condition rose to the level of a serious medical need, summary judgment is appropriate. *See, e.g.*, *Leach v. Ritz*, 2019 WL 8063921, at *3 (S.D. Ill. Sept. 9, 2019) ("The objective findings in Plaintiff's medical records do not appear to establish Plaintiff's keloids constituted a serious medical need."); *Wheeler v. Talbot*, 2015 WL 12600342, at *5 (C.D. Ill. Oct. 1, 2015) (granting summary judgment in favor of prison physician where the inmate-plaintiff "failed to offer any evidence that his keloids are a serious medical condition for purposes of the Eighth Amendment"); *Pelzer v. McCall*, 2011 WL 3021126, * 8 (D.S.C. June 30, 2011) (granting summary judgment where inmate-plaintiff failed to "put forth any objective medical evidence that his keloids cause the pain he alleges he experienced or that his keloids require a certain type of medical treatment").

V. Conclusion

For the reasons stated herein, Defendants' Motion for Summary Judgment is granted. A separate judgment will follow.

DATED this 27th day of March, 2023.

BY THE COURT:

RICHARD A. LANZILLO
CHIEF UNITED STATES MAGISTRATE JUDGE